UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>PLAINTIFFS,<br><br>-against-<br><br>MONAC SUPPLY INC., VUE SUPPLY INC., VIACHESLAV BOBKOV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>DEFENDANTS. | CIVIL ACTION<br><br>26-CV-1006<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Monac Supply Inc. ("Monac"), Vue Supply Inc. ("Vue"), (Monac and Vue, are collectively referred to herein as "**Retailers**"), Viacheslav Bobkov ("Bobkov") (the Retailers and Bobkov are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least September 2022 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $262,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for pain management and/or post-surgical rehabilitative durable medical equipment ("DME") devices, in particular, Continuous Passive Motion ("CPM") Devices, pneumatic and/or cold compression devices ("Compression Devices"), and Sustained Acoustic Medicine units (hereinafter "SAM

Units") (collectively "Rental DME). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, CPM devices, ultrasound therapy devices, laser therapy devices, sustained acoustic medicine devices and compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every piece of Rental DME supplied by the Retailers were provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, Defendant Bobkov, through one or more of the Retailers, entered into separate arrangements with a purported DME wholesale company, MagnoUSA Inc. (not named as a defendant in the Complaint), with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners, and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

2

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating, falsifying, duplicating, and/or issuing unauthorized DME prescriptions for expensive and medically unnecessary DME in connection with a pre-determined protocol designed to maximize reimbursement by insurance companies; and/or

(iii) ensuring that the prescriptions were provided directly to the Retailers to ensure that Bobkov, through the Retailers, could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of template and/or boilerplate descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME, prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, the Retailers routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      In that regard, as a result of the large volume of fraudulent prescriptions provided by the No-fault Clinics to the Retailers, the No-fault Clinics enabled Bobkov, through the Retailers, to bill hundreds of thousands of dollars to Plaintiffs, for just a few devices that exceed thousands of dollars in cost, despite the fact that the Retailers did not conduct any legitimate marketing or

advertising, did not offer or sell a variety of DME beyond the few devices they dispensed, and that Defendants the Retailers lacked any discernable accessible retail locations.

9.    On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

10.    On information and belief, in many instances, Bobkov, through the Retailers, submitted or caused to be submitted to Plaintiffs prescription forms which he knew to be fabricated, fraudulently altered, duplicated, and/or unauthorized, in order to misrepresent the nature and/or type and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

11.    On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, MagnoUSA, provided one or more of the Retail Defendants with inexpensive and/or cheap knockoff items of expensive medical equipment, along with fraudulent wholesale invoices that grossly inflated the amounts the Retail Defendants paid for the Rental DME. Indeed, in many instances, the wholesale invoices provided by MagnoUSA to one or more of the Retail Defendants fraudulently reflected that the charges for DME had been paid in full, demonstrating that the "invoices" were, in fact, not actual bills sent to the Retail Defendants but, rather, sham documents designed solely for the purpose of creating the illusion that the Retail Defendants paid the grossly inflated prices on the wholesale invoices.

12.    After obtaining the fraudulent prescriptions from the No-fault Clinics, and/or fraudulent wholesale invoices from MagnoUSA, Bobkov, through one or more of the Retailers, generated and submitted or caused to be generated and submitted bills to Plaintiffs, among others,

knowingly misrepresenting the nature and type of the items, the amounts they were entitled to be reimbursed and/or and the medical necessity of the purportedly prescribed Rental DME.

13.     On information and belief, the Defendants acted in concert with one another pursuant to a common scheme or plan, obtaining fraudulent prescriptions from the same referring providers, Rental DME from the same wholesaler, and submitting charges for reimbursement on the same claims, with each Retailer providing a different price of Rental DME in furtherance of a fraudulent protocol of treatment for medically unnecessary Rental DME supplied as part of an elaborate kickback scheme in order to maximize reimbursement.

14.     In order to execute the scheme to defraud, at all relevant times mentioned herein, Bobkov, through the Retailers, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of Rental DME; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated, fraudulently altered, duplicated, and/or unauthorized; (iv) paying fees to MagnoUSA in exchange for fraudulent wholesale invoices that the Retail Defendants, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics and/or HCPs to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically mailed or caused to be mailed, through the Retailers, bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that Bubkov, through the Retailers, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving virtually identical Rental DME.

5

15.    At all relevant times mentioned herein, each and every claim submitted by the Retailers to insurers, in general, and Plaintiffs, in particular, consisted of a claim form or bill, prescription and other purported supporting documentation that Bobkov mailed or caused to be mailed through the Retailers to insurers, in general, and Plaintiffs, in particular.

16.    At all relevant times mentioned herein, each and every bill and supporting documentation submitted by the Retail Owner Defendants contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature and type of DME purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the DME purportedly supplied to Covered Persons, which generically described the item(s) in order to conceal the nature and type of item(s) being prescribed and/or provided; (v) false and misleading wholesale invoices that greatly inflated the true cost and/or quantity of the Rental DME purportedly supplied to Covered Persons, and/or which falsely described that the invoices had been paid in full; and (vi) fabricated, false and misleading prescriptions for DME, concealing the fact that the DME either were not prescribed as alleged, or was prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby the Retailers paid kickbacks to No-fault Clinics to induce the No-fault Clinics and/or associated HCPs to provide the same medically unnecessary devices to nearly all Covered Persons. All of the foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the Retailers could submit to Plaintiffs and other insurers under the No-fault Law.

17.    By way of further example and not limitation of Defendants' nearly identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, containing the same handwriting and typed notations. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

18.    In carrying out the scheme to defraud, Defendants stole in excess of $262,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

19.    Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York. Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

20.    As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to

fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME. Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

21.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, the Retailers accepted (and continue to accept) assignments of benefits from Covered Persons and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

22.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., the Retailers submitted (and continue to submit) claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

23.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Retailers contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

24.     At all relevant times mentioned herein, the Retailers identified the Rental DME they purportedly provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

25.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

26.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

27.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

28.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers'

Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

29.    At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

30.    Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

31.    The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

32.    Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment,

medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

33.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

34.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule. At all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

35.     At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

36.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

37.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

38.     At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See* Government Employees Insurance Company v. MiiSupply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

39.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021)

(http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (February 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

40.    In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter "WCB DME Fee Schedule"). *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

41.    Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule lists DME and orthotic devices by their corresponding HCPCS Level II Codes.

42.    With respect to rental DME, at all relevant times mentioned herein on or after April 4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited to as follows:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

43.    With the exception of, among other things, the prior authorization requirement for DME either not listed on the WCB Fee Schedule or listed without a maximum reimbursement amount, the WCB DME Fee Schedule applies to the reimbursement under the No-fault Law of items listed in the WCB DME Fee Schedule provided on or after April 4, 2022.

44.     To address the potential for fraud and abuse, the elimination of a cost-containment system, and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates in the No-fault context by the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

45.     By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

46.     DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

**Part E. Durable medical equipment fee schedule**.

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

(1) acquisition cost plus 50%; or

(2) usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

(2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)    acquisition cost plus 50%;

(ii)    usual and customary price charged by durable medical equipment providers to the general public; or

(iii)    purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

47.    At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R, § App.17-C Part E.

48.    At all relevant times mentioned herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30,

2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

49.    At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

50.    Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

51.    At all relevant times mentioned herein, nearly each and every bill mailed or caused to be mailed to Plaintiffs by Bobkov, through the Retailers, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME, DME and/or orthotic devices provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME. To the extent the Rental DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

52.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

53.    As part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows,

cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, one or more of the Retailers delivered expensive rental pain management DME to Covered Persons that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. In addition, after receiving the foregoing standard batter of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary. On the same day as the surgery, and/or within a few short days of the surgery, one or more of the Retailers, among others, deliver to the Covered Persons expensive Rental DME that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. In many cases, the Covered Persons receive three or more such medically unnecessary items, for up to 42 days or longer, in some cases exceeding $30,000.00 in a total cost for all of the items, as part of the scheme to financially enrich the providers, and the Retailers in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

54.     On information and belief, the Retailers were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

55.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered

Persons with medically unnecessary equipment pursuant to a pre-determined treatment protocol and/or inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising Covered Persons' health.

56.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blue print as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the DME purportedly provided, was carried out for the purpose of committing fraud.

57.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retailers'  No-fault claims because Bobkov, through the Retailers, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of the Retailers and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

58.    By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of the more than $289,000.00 of unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

59.    This action is brought pursuant to:

i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)    New York State common law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

60.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

61.    Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the Retailers' unpaid No-fault claims because:

i)    Bobkov, through the Retailers, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)    Bobkov, through the Retailers, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

62.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded in an amount in excess of $262,000.00 the exact amount to be determined at trial, through payments which Defendants received for fraudulently billing Plaintiffs for Rental DME that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

A.    **Plaintiffs**

63.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

64.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

65.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

66.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

67.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

68.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.**    **The Individual Defendant**

69.    Viacheslav Bobkov ("Bobkov") is a natural person residing in the State of New York, is the principal, officer, and/or director of the Retailers, and, at all times relevant herein, operated, managed, and/or controlled their activities.

70.    Bobkov directly participated in scheme to defraud alleged herein by (i) operating and managing the affairs of the Retailers, (ii) obtaining and establishing or directing the obtainment and establishment of referrals sources to ensure a steady flow of prescriptions of Rental DME and orthotic devices submitted through the Retailers to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (iii) ordering and maintaining and/or directing the ordering and maintaining of the inventory of bogus Rental DME and orthotic devices purportedly dispensed by the Retailers to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (iv) directing and causing the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, by the Retailers to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (v) creating and fabricating and/or causing the creation and fabrication of the documents/forms submitted through the Retailers to insurers in general, and Plaintiffs in particular, in support of the Retailers' fraudulent No-fault claims; (vi) determining and directing the documents to be submitted to insurers in general, and Plaintiffs in particular, in support the of the Retailers' fraudulent No-fault Claims; (vii) determining and directing the false billing codes and price information to be used on the Retailers' claim submissions to insurers in general, and Plaintiffs in particular; and (viii) mailing or causing the mailing of fraudulent No-fault claims for reimbursement through the Retailers, to insurers in general, and Plaintiffs in particular, for DME and/or orthotic devices prescribed and dispensed by

the Retailers, to the extent they are dispensed at all, in connection with a predetermined protocol of treatment irrespective of medical necessity.

**C.      The Retailer Defendant**

71.      Monac Supply Inc. ("Monac") was formed on or about September 20, 2022, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 111 Brighton 11th Street, Suite 5, Brooklyn, New York 11235. Monac is operated, managed, and/or controlled by Defendant Bobkov and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME under the No-fault Law.

72.      Vue Supply Inc. ("Vue") was formed on or about May 11, 2023, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 414 Brighton Beach Ave, Brooklyn, New York 11235. Vue is operated, managed, and/or controlled by Defendant Bobkov and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME under the No-fault Law.

**D.      The John Doe Defendants**

73.      On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.      The ABC Corporations**

74.      On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or Covered Persons in furtherance

of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

75.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

76.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

77.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

78.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

79.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

80.    Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

81.    As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

82.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for their services, the Retailers accept assignments of benefits from Covered Persons covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

83.     To process and verify the claims submitted by the Retailers, Plaintiffs required, and the Retailers, submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which the Retailers were seeking reimbursement from Plaintiffs.

84.     In nearly all instances, the prescriptions submitted in support of the Retailers' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

85.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, the Retailers made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental DME and all included services that was provided to the Covered Person; and

- The fees sought for the billed for Rental DME did not exceed that permissible under the No-fault law and regulations.

86.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process the Retailers' claims within 30 days of receipt of proof of claim.

87.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and paid the Retailers based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

88.    At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

89.    At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

90.    At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)  the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)  the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

91.    At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

92.    Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

93.    At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

94.    At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum

reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC*, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

95.     On April 4, 2022, the WCB's amendments to 12 N.Y.C.R.R. § 442.2 took effect, including the establishment of the WCB DME Fee Schedule. As part of the WCB's establishment of the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

96.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

97.     At all times mentioned herein on or after April 4, 2022, for WCB DME Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

98.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

99.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: "[t]he maximum permissible purchase charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public." 11 N.Y.C.R.R. § App.17-C Part(c) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E(c), (d)(2). (Final Adoption effective February 15, 2023). Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E(b)

(promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

100.    The Retailers were created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of Rental DME.

101.    The Rental DME that Retailers purported to provide, and for which they billed Plaintiffs, seldom varied from Covered Person-to-Covered Person over a given period of time and also did not change based on any differences in the Covered Persons' condition, age, complaints, type of accident, or nature of alleged injury. Instead, Bobkov, through the Retailers, created a billing apparatus which implemented a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every Covered Person, including those who required little or no DME at all.

102.    Bobkov created and controlled the Retailers, which were part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME. The components of the enterprise followed practices that were part of a racketeering scheme dictated by Bobkov, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, misrepresented the nature, quality, and cost of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, submitted bills to Plaintiffs for Rental DME that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, submitted prescriptions, bills, and delivery receipts to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were issued in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, and/or those acting under their direction and control, had agreements and/or understandings as to what generic Rental DME would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, arranged to have prescriptions for Rental DME the Covered Persons to select their own DME retailers; and

- Unlike legitimate retail DME companies, Bobkov, through the Retailers, entered into illicit relationships with the No-fault Clinic, which, in exchange for kickbacks and/or a fee, provided the Retailers with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

103. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

104. Bobkov, as a member of each of the Retailers enterprises alleged herein, played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of the scheme to defraud, on information and belief, Bobkov engaged in one or more the following with respect to each Retailer:

- Entered into financial arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their HCPs prescribed large amounts of virtually identical DME to their Covered Person population, and/or fabricate prescriptions issued by the HCPs, in order to bill insurers, in general, and Plaintiffs in particular, pursuant to a predetermined course of treatment, irrespective of medical necessity;

- Entered into financial arrangements with wholesalers including, but not limited to, MagnoUSA not named as defendants in this action, in which the wholesalers supplied one or more of the Retailer Defendants with inexpensive and/or cheap knockoff items of expensive medical equipment and/or generated wholesale invoices which grossly inflated the amounts the Retailers paid for the Rental DME in order for the Retailers to exploit and manipulate the payment formulas under the No-fault Law and implementing regulations to maximize the charges that they could submit to Plaintiffs;

- Ordered and maintained the inventory of bogus Rental DME and orthotic devices purportedly dispensed to Covered Persons in connection with a fraudulent predetermined protocol of treatment;

- Directed and/or caused the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, to Covered Persons in connection with a fraudulent predetermined protocol of treatment;

- Caused the creation and fabrication of the documents/forms submitted through the Retailers to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the Retailers, prescription forms in support of requests for payment for Rental DME, which he knew to be fabricated;

- Prepared or caused to be prepared fraudulent bills to be mailed, through each Retailer, to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims, through each Retailer, to Plaintiffs, knowing that they contained materially false and misleading information.

105.    At all relevant times mentioned herein, Defendants knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME, DME and/or other equipment.

106.    At all relevant times mentioned herein, Bobkov, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms through and in the name of each Retailer, to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

107.    At all relevant times mentioned herein, Bobkov and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

108.    Beginning on September 7, 2022, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of CPM Devices, Cold Compression Devices and SAM Units, to Covered Persons.

109.    At all relevant times mentioned herein, Bobkov incorporated, formed, owned and/or controlled the Retailers for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

110.    Bobkov, through the Retailers, engaged in a pervasive scheme to defraud, wherein Bobkov: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME ; (ii)

obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated; (iv) arranged for the No-fault Clinics to have assignments of benefits forms and delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; (v) obtained inflated and otherwise fraudulent wholesale invoices from one or more non-party sham wholesalers, including, but not limited to, MagnoUSA, that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, Bobkov, through the Retailers, along with one or more of Defendants John Does 1 through 5, determined the Rental DME that would be prescribed by the same HCPs at the No-fault Clinics, with virtually every Covered Person receiving the same Rental DME regardless of medical necessity.

111.    The Retailers were sham entities that were opened and used to bill for only a short few months at a time as quick-strike providers of expensive Rental DME in order to maximize reimbursement without regard to medical necessity before being closed down. In fact, Monac billed for Rental DME allegedly provided over only an approximate five-month period. Vue billed for Rental DME allegedly provided over an approximate two-month period. Notwithstanding, Defendants' attempts to collect on unpaid bills continue to the time of the filing of this complaint.

112.    In addition, each of the Retailers had no internet website or online footprint, and each operated without advertising or marketing to the general public or without making any

legitimate efforts to attract patients or customers who might need medical equipment. The Retailers each lacked any accessible retail location, each lacked any genuine office location.

113. By way of example and not limitation, Monac is purportedly located at 111 Brighton 11th Street, Suite 5, Brooklyn, New York 11235, a residential property that does not appear to show any sign that a medical supply company operated there.

114. By way of example and not limitation, Vue is purportedly located at 414 Brighton Beach Ave, Brooklyn, New York 11235, a commercial property that appears to currently be occupied by Turkish restaurant and that does not appear to show any sign that a medical supply company operated there.

115. Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

116. Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of Rental DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

117.    Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

118.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the Retailers by: (i) causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature and type of any DME could not be verified based on the description of the prescribed item alone.

119.    In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted to Plaintiffs bills for the Rental DME based upon fraudulent, pre-printed prescription forms purportedly issued by Robert Drazic, DO (not named as a defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named as a defendant in the Complaint) and Anjani Sinha, MD (not named as a defendant in the Complaint), of Atlantic Medical & Diagnostic, P.C. (not named as a defendant in the Complaint), which contained photocopied or stamped signatures on pre-printed forms. By way of example and not limitation:

**Prescriptions from Robert Drazic, DO to Monac Supply**

10/11/2022
Covered Person A.C.
Claim no. 0682113501-02

Undated
Covered Person J.W.
Claim no. 0684380645-01

**Prescriptions from Anjani Sinha, MD to Monac Supply**

Undated
Covered Person F.A.
Claim no. 0694240615-02

Physician Signature: _____

Physician Name: _Dr. Anjani Sinha_____

NPI Number: _1932233715_____

License Number: _____

Address: _164-10 Northern Blvd., Ste 204, Flushing NY 11358_

TEL: _718-886-2011_____

Undated
Covered Person Q.D.
Claim no. 0684910433-06

Physician Signature: _____

Physician Name: _Dr. Anjani Sinha_____

NPI Number: _1932233715_____

License Number: _____

Address: _164-10 Northern Blvd., Ste 204, Flushing NY 11358_

TEL: _718-886-2011_____

## Prescriptions from Robert Drazic, DO to Vue

Dated 06/03/2023
Covered Person R.J.
Claim no. 0676156011-02

PHYSICIAN'S INFORMATION:

Physician Print Name: _Dr. Robert Drazic_____

Physician Address: _185 Kingsland Street_____

City: _Nutley_____ State: _N.J_ Zip Code: _07110_ Phone: _855-699-7246_

NPI #: _1578559001_____ License # : _218271_

Physicians Signature: _Robert Drazic_____ Date: _6/17/23_

NOTE: Please include (FAX or Email) all the appropriate Medical Notes with the Prescription

Dated 6/30/2023
Covered Person G.R.
Claim no. 0709525090-01

PHYSICIAN'S INFORMATION:

Physician Print Name: _Dr. Robert Drazic_____

Physician Address: _185 Kingsland Street_____

City: _Nutley_____ State: _N.J_ Zip Code: _07110_ Phone: _855-699-7246_

NPI #: _1578559001_____ License # : _218271_

Physicians Signature: _Robert Drazic_____ Date: _6/30/23_

Dated 3/22/23
Covered Person K.S.
Claim no. 0708177381-06



Dated 6/01/2023
Covered Person T.I.
Claim no. 0707232039-05



Dated 5/25/2023
Covered Person K.G.
Claim no. 0705165140-02



120.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME. Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

121.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

122.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, the Retailers routinely deliberately obscured identifying information relating to the

billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

123.    Furthermore, as part of the scheme to defraud described herein, the Retailers routinely utilized pre-printed "Delivery Receipts," purportedly signed by the respective Covered Persons, containing a virtually identical format, print font, and language referring to the Rental DME, merely changing the name of the particular Retailer and Covered Person on each receipt.

124.    As a matter of pattern, practice, and protocol, the Retailers routinely provided Covered Persons with expensive CPMs, Compression Devices, and SAM Units, that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

125.    In furtherance of the scheme to defraud alleged herein, though there were four different Retailers submitting bills to Plaintiffs for different Rental DME, the Retailers each used the same "miscellaneous" billing code – E1399, based on the fraudulent, pre-printed prescriptions allegedly issued by the HCPs, in many instances bearing their photocopied or stamped signatures.

126.     Furthermore, Vue purportedly purchased, at exorbitant wholesale prices, the Rental DME from a wholesaler, MagnoUSA, that in turn, purportedly delivered the Rental DME directly to the Vue at its phony office locations, which exhibited no capacity to actually receive the DME. A representative sample of wholesale invoices purportedly issued by MagnoUSA to Vue, which, in turn, were submitted by Vue to Plaintiffs is as follows:



127.     However, on information and belief, these invoices are complete fabrications. Notably, MagnoUSA's original incorporation address in Pennsylvania is the same address and suite number used by another similarly named New York corporation, called Magno US, Inc., which was incorporated and owned by an individual, Yevhenii Trushnikov ("Trushnikov") (not

named as a Defendant in the Complaint), who is owner of record of multiple medical supply companies operating in New York, including, but not limited to, Pelle Supply Inc. (not named as a Defendant in the Complaint). Trushnikov has been named as a defendant in a recently filed insurance fraud action in connection with his ownership of another medical supply company, Nova Tech Supply Inc. *See* LM Insurance Corporation et al v. Abdalla I. Adam, M.D., d/b/a Medelstar Medical Services, et al., 24-cv-04153-EK-MMH (E.D.N.Y. 2024).

128.    On information and belief, MagnoUSA is a shell company owned by Trushnikov used to funnel kickback payments into cash to the Retailers.

129.    In furtherance of the scheme to defraud alleged herein, Babkov, through Vue, utilized the phony common wholesale invoices from MagnoUSA, the pre-printed prescription forms, and pre-printed delivery receipts to create the false appearance that Vue was a legitimate company entitled reimbursement when, in fact it was neither.

130.    In furtherance of the scheme to defraud and as part of the unlawful financial arrangements with the John Doe and/or ABC Corporations, in order to obtain prescriptions for Rental DME purportedly issued by the HCPs, on information and belief, the Retail Defendants would pay thousands of dollars in kickbacks to the John Doe and/or ABC Corporation Defendants that, in some instances were fictitious businesses, existing for no legitimate purpose other than to facilitate the fraudulent scheme.

131.    On information and belief, pursuant to these unlawful financial arrangements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Retail Defendants entered into agreements with one or more purported wholesale DME companies that provided the Retailers with Rental DME, along with fraudulent wholesale invoices that either grossly inflated the amounts the Retailers paid

for the Rental DME; or reflected Rental DME that was never actually provided to Retailers. In fact, irrespective of whether any DME was actually provided to Retailers, the wholesale invoices were fictitious, inflated or otherwise fraudulent, the invoices were sufficiently generic and devoid of detail to allow the Retailers to seek reimbursement for expensive, complex DME in amounts that far exceeded amounts they were entitled to receive under the No-fault Law.

132.    In numerous instances, two or more Covered Persons that were purportedly injured in the same accident would receive identical or virtually identical prescriptions for DME despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

133.    On information and belief, it is improbable that two or more Covered Persons in the same motor vehicle accident would suffer substantially similar injuries, be in similar physical health and/or have similar symptoms that would require identical or virtually identical DME, let alone multiple Covered Persons.

134.    In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical Rental DME, among other items, to two or more Covered Persons who were involved in the same accident:

- On September 13, 2022, Covered Persons J.W., claim no. 0684947088-01; and G.S., claim no. 0684947088-02 were involved in the same accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME devices from Defendant Monac for the same time period despite the fact that their injuries were almost certainly different.

- On April 23, 2023, Covered Persons M.G., claim no. 0711223206-02; and Y.C., claim no. 711223206-06 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME devices from Defendant Vue, pursuant to prescriptions issued by Robert Drazic, DO (not named as a Defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named a defendant in the

Complaint), a No-fault clinic located at 185 Kingsland Street, Nutley, New Jersey 07110, for the same time period despite the fact that their injuries were almost certainly different.

- On April 23, Covered Persons I.S.N., claim no. 0711223784-02; and H.S.N., claim no. 711223784-03 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same Rental DME devices from Defendant Vue, pursuant to prescriptions issued by Robert Drazic, DO (not named as a Defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), a No-fault clinic located at 185 Kingsland Street, Nutley, New Jersey 07110, for the same time period despite the fact that their injuries were almost certainly different.

135.    In furtherance of the fraudulent protocol of treatment, the specific DME prescribed often contradicted the purported treatment plan of the HCPs.

136.    In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed was not documented in the initial examination report, follow-up examination report and/or operative report of the HCP at the No-fault Clinics where the Covered Persons were treated. To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the prescriptions issued by the HCPs. On many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were issued on dates that the Covered Persons did not treat with the HCPs. In addition, on many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were left undated, obscuring when the prescription was issued and when legitimately prescribed DME would have been noted in the prescribing HCP's treatment notes. By way of example and not limitation:

- On November 17, 2022, Covered Person Q.D., claim no. 0684910433-06 purportedly presented at East Tremont Medical Center (not named a defendant in the Complaint) for an arthroscopic procedure, in the midst of a course of treatment at a No-fault Clinic located at 652 East Fordham Road,

Bronx, New York 10458. The corresponding surgical report made no mention of any prescription or recommendation for rental DME. Notwithstanding, Defendant Monac submitted bills pursuant to prescriptions issued by Anjani Sinha, M.D. (not named as a Defendant in the Complaint) of Anjani Sinha Medical P.C. (not named as a Defendant in the Complaint) prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| Q.D. | Undated | Cold Therapy and Compression Device | E1399 | $2,660.00 |
| | 11/17/2022 | Shoulder Orthosis | L3670 | $251.34 |
| | Undated | Shoulder CPM | E0936 | $3,079.72 |

- On May 19, 2023, Covered Person K.S., claim no. 0708177381-06 purportedly presented at East Tremont Surgery Center (not named a defendant in the Complaint) for an arthroscopic procedure, in the midst of a course of treatment at a No-fault Clinic located at 1975 Linden Boulevard, Elmont, New York 11003. The corresponding surgical report made no mention of any prescription or recommendation for rental DME. Notwithstanding, Defendant Vue submitted bills pursuant to prescriptions issued by Robert Drazic, DO (not named as a Defendant in the Complaint) from Tri-Borough NY Medical Practice P.C. (not named as a Defendant in the Complaint) prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| K.S. | 5/22/2023 | Shoulder Wrap | E1399 | $884.99 |
| | | Ultrasound Therapy Device | E1399 | $1,988.99 |
| | | Cold and Compression Therapy Unit | E1399 | $1,799.99 |
| | | Compression Hose with Wiring Adapter | E1399 | $1,799.99 |
| | | Ultrasound Patches | E1399 | $349.99 |
| | | Ultrasound Therapy Wiring with Battery Pack | E1399 | $1,798.50 |

- On June 1, 2023, in the midst of a course of treatment at a No-fault Clinic located at 488 Lafayette Avenue, Brooklyn, New York 11205, Covered Person T.I., claim no. 0707232039-05 purportedly presented at Global Surgery Center (not named a defendant in the Complaint) for an arthroscopic procedure, yet the surgical report made no mention of any prescription or recommendation for rental DME. Notwithstanding, Defendant Vue submitted a bill pursuant to prescriptions issued by Robert Drazic, DO (not named as a Defendant in the Complaint) from Tri-Borough NY Medical Practice P.C. (not named as a Defendant in the Complaint) prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| T.I. | 6/01/2023 | Knee Wrap | E1399 | $839.99 |
| | | Ultrasound Therapy Device | E1399 | $1,988.99 |
| | | Cold and Compression Therapy Unit | E1399 | $1,799.99 |
| | | Compression Hose with Wiring Adapter | E1399 | $1,799.99 |
| | | Ultrasound Patches | E1399 | $349.99 |
| | | Ultrasound Therapy Wiring with Battery Pack | E1399 | $1,798.50 |

137.    The foregoing are only representative examples of the claims that Bobkov mailed or caused to be mailed through each Retailer to Plaintiffs. In many of the mailings that Bobkov caused to be made through the Retailers identified in the Appendix to the Complaint and claims identified in Exhibits "2" and "3", the Retailers billed for Rental DME purportedly supplied to Covered Persons notwithstanding that the HCP who wrote the prescription never mentioned the DME in the contemporaneous examination, operative, and/or follow up reports.

138.    In furtherance of the scheme to defraud alleged herein, and to obtain access to Covered Persons for which the Retailers submitted fraudulent claims for Rental DME to Plaintiffs and insurers in general, the Retail Defendants entered into collusive arrangements with the prescribing No-fault Clinics and the John Doe and ABC Corporation Defendants in order to obtain prescriptions for the Rental DME purportedly supplied by the Retailers.

139.    The Retail Defendants engaged in these unlawful financial arrangements with the John Doe and/or ABC Corporation Defendants, including paying kickbacks in exchange for obtaining prescriptions for the Rental DME provided by the Retailers, among other durable medical equipment suppliers that billed on the claims. The unlawful financial arrangements allowed the Retailer Defendants to submit hundreds of charges for the Rental DME that were billed in accordance with a predetermined course of treatment, irrespective of medical need, established

at the No-fault Clinics, which almost exclusively treat No-fault Covered Persons, in amounts that far exceeded what the Retail Defendants were entitled to be reimbursed.

140.    The No-fault Clinics that supplied the Retailers with nearly identical, boilerplate prescriptions for Rental DME came from clinic locations with a "revolving door" of medical providers, including, but not limited to the following clinic locations: (i) 611 East 76th St., Brooklyn, New York 11236, (ii) 49 N. Franklin St., Hempstead, New York 11550, (iii) 106-02 Northern Blvd., Corona, New York 11368, (iv) 4920 Avenue K, Brooklyn, New York 11234, (v) 788 Southern Blvd., Bronx, New York 10455, (vi) 1877 Webster Ave., Bronx, New York 10457, (vii) 164-10 Northern Blvd., Flushing, New York 11358, and (viii) 1 Fulton Ave., Hempstead, New York 11550.

141.    Though ostensibly organized to provide a range of healthcare services to Covered Persons at a single location, the No-Fault Clinics from where the Retail Defendants obtained the prescription and referrals for the Rental DME, in actuality, were organized to supply "one-stop" shops for No-Fault insurance fraud.

142.    On information and belief, unlicensed laypersons, rather than the healthcare professionals working in the No-fault Clinics, created and controlled the purported patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care by exploiting the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular.

143.    By way of example but not limitation, in furtherance of the scheme to defraud, a significant amount of the prescriptions for DME, resulting in claims submitted by Bobkov, through the Retailers, to Plaintiffs, were issued by medical providers that purportedly provided medical

45

services through Tri-Borough NY Medical Practice P.C. ("Tri-Borough") (not named as a defendant in the Complaint). Tri-Borough is a professional corporation in which Leonid Shapiro ("Shapiro") (not named as a defendant in the Complaint) is listed as the record owner and which operates out of as many as 30 different locations throughout the New York metropolitan area. Shapiro, and several professional corporations in which he is listed as the record owner, including Tri-Borough, have been sued by multiple No-fault insurance carriers for allegedly engaging in various multimillion-dollar fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Government Employees Ins. Co., et al. v. Moshe, et al.*, 20-cv-1098 (FB) (RER) (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co., et al. v. Metro Pain Specialists P.C., et al.*, 21-cv-5523 (MKB) (PK) (E.D.N.Y. 2021); *Allstate Ins. Co., et al. v. Metro Pain Specialists Professional Corporation, et al.*, 21-cv-5586 (DG) (RER) (E.D.N.Y. 2021).

144.    By way of further example but not limitation, numerous other fraudulent prescriptions for DME, resulting in claims submitted by Bobkov, through the Retailers, to Plaintiffs, were also issued by medical providers that purportedly provided medical services through Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical") (not named as a defendant in the Complaint). Atlantic Medical is a professional corporation in which Jonathan Landow ("Landow") (not named as a defendant in the Complaint) is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Landow and several professional corporations in which he is listed as the record owner, including Atlantic Medical, were sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and

engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Allstate Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. Cty.).

145.    On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Retail Defendants would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Rental DME be provided to Covered Persons who treated at the Clinics.

146.    On information and belief, in keeping with the fact that the prescriptions for Rental DME were the result of unlawful kickbacks and/or referral relationships between the rental Defendant and the Clinics, Bobkov never met most of the HCPs who issued the prescriptions that were provided to the Retail Defendants. Moreover, a number of the prescriptions submitted by Bobkov, through the Retailers, to Plaintiffs, were fabricated and/or fraudulently altered and/or duplicated in order to misrepresent that Rental DME, including but not limited to, cold compression devices and ultrasound therapy devices, were medically necessary, when in fact, the Rental DME were provided, if at all, to financially enrich Bobkov through a fraudulent protocol of treatment. By way of example and not limitation:

**Prescriptions from Drazic to Monac Supply**

10/11/2022
Covered Person A.C.
Claim no. 0682113501-02

Undated
Covered Person J.W.
Claim no. 0684380645-01

**Prescriptions from Sanha to Monac Supply**

Undated
Covered Person F.A.
Claim no. 0694240615-02

Physician Signature: _____

Physician Name:    Dr. Anjani Sinha

NPI Number:    1932233715

License Number: _____

Address:    164-10 Northern Blvd., Ste 204, Flushing NY 11358

TEL:    718-886-2011

Undated
Covered Person Q.D.
Claim no. 0684910433-06

Physician Signature: _____

Physician Name:    Dr. Anjani Sinha

NPI Number:    1932233715

License Number: _____

Address:    164-10 Northern Blvd., Ste 204, Flushing NY 11358

TEL:    718-886-2011

**Prescriptions from Drazic to Vue**

Dated 06/03/2023
Covered Person R.J.
Claim no. 0676156011-02

PHYSICIAN'S INFORMATION:
Physician Print Name: Dr. Robert Drazic
Physician Address: 185 Kingsland Street
City: Nutley          State: N.J     Zip Code: 07110    Phone: 855-699-7246
NPI #: 1578559001              License #: 218271
Physicians Signature: Robert Drazic          Date: 6/7/23

Dated 6/30/2023
Covered Person G.R.
Claim no. 0709525090-01

PHYSICIAN'S INFORMATION:
Physician Print Name: Dr. Robert Drazic
Physician Address: 185 Kingsland Street
City: Nutley          State: N.J     Zip Code: 07110    Phone: 855-699-7246
NPI #: 1578559001              License #: 218271
Physicians Signature: Robert Drazic     Date 6/30/23

Dated 3/22/23
Covered Person K.S.
Claim no. 0708177381-06

PHYSICIAN'S INFORMATION:
Physician Print Name: Dr. Robert Drazic
Physician Address: 185 Kingsland Street
City: Nutley          State: N.J     Zip Code: 07110    Phone: 855-699-7246
NPI #: 1578559001              License #: 218271
Physicians Signature: Robert Drazic          Date: 3/22/23

NOTE: Please include (FAX or Email) all the appropriate Medical Notes with the Prescription

Dated 6/01/2023
Covered Person T.I.
Claim no. 0707232039-05

Physician Signature: Robert Drazic
Physician Name:    Robert Drazic
NPI Number:       1578559001
License Number:  21871
Address:            185 Kingsland Street, Nutley NJ 07110
TEL:              855-699-7246

Dated 5/25/2023
Covered Person K.G.
Claim no. 0705165140-02

PHYSICIAN'S INFORMATION:
Physician Print Name: Dr. Robert Drazic
Physician Address: 185 Kingsland Street
City: Nutley          State: N.J     Zip Code: 07110    Phone: 855-699-7246
NPI #: 1578559001              License #: 218271
Physicians Signature: Robert Drazic          Date: 5/25/2023

NOTE: Please include (FAX or Email) all the appropriate Medical Notes with the Prescription

49

147.    Further, the prescriptions from the Clinics were sent to and obtained by the Retailers directly from the Clinics without any communication or involvement by the Covered Persons. In further keeping with the fact that the prescriptions for the Rental DME were the result of unlawful financial arrangements between the Retail Defendants and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other DME retailer for the Rental DME other than the Retailers.

148.    At all relevant times mentioned herein, each and every piece of Rental DME supplied by the Retailers was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to the Retailers to be used in support of the fraudulent Rental DME claims that exploited and manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

149.    As a result of the unlawful kickback and/or other financial compensation agreements, the Retail Defendants obtained large numbers of prescriptions and access to Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiffs, for just a few exorbitantly priced Rental DME.

150.    But for the payment of kickbacks from the Retail Defendants, the No-fault Clinics, in conjunction with the HCPs, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to the Retailers; (ii) make the Covered Persons' information available to the Retailers; and/or (iii) provide the Retailers with the fraudulent prescriptions.

151.    Upon information and belief, the payment of kickbacks and/or other financial compensation by the Retail Defendants was made at or near the time the prescriptions were issued,

but the Retail Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

152.    As a result of the unlawful financial arrangements, the Retail Defendants billed hundreds of thousands of dollars to Plaintiffs, and likely millions of dollars to other New York automobile insurers, for the Rental DME.

153.    On information and belief, in furtherance of the scheme to defraud alleged herein, Vue purchased inexpensive Rental DME from MagnoUSA, not named as a defendant herein, if any Rental DME was purchased at all, that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

154.    In furtherance of the scheme to defraud alleged herein, Bobkov routinely mailed or caused to be mailed fraudulent documents, including, but not limited to, claim forms, prescriptions, and delivery receipts, through the Retailers that materially misrepresented and/or concealed the nature and type of Rental DME purportedly provided to Covered Persons.

155.    In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive Rental DME that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

156.    In furtherance of the scheme to defraud alleged herein, the Retailers' bills intentionally omitted the make, model, and manufacturer of the Rental DME purportedly provided to Covered Persons in order to conceal the nature and type of Rental DME provided, to the extent they were provided at all.

157.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill mailed or caused to be mailed by Bobkov, through the Retailers, deliberately obscured all identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

158.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

159.    In furtherance of the scheme to defraud alleged herein, the Retailers, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

160.    As part of the scheme, the Covered Persons receiving the expensive rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment. Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

161.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of standard DME and/or orthotic devices, as part of Defendants' fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME by the HCPs operating out of the No-fault Clinics, including the Rental DME billed for and purportedly dispensed by the Retailers.

162.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are in many instances eventually referred for arthroscopic surgery and/or other procedures at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

163.    Prior to the surgery, the Covered Persons are often prescribed expensive, pain management rental DME and/or compression devices, together with a standard battery of standard DME and/or orthotic devices. Then, on the same day as the surgery, and/or within days of the surgery, the Covered Persons are again prescribed expensive rental DME and/or compression devices, together with a standard battery of standard DME and/or orthotic devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, between the pain management Rental DME prescribed out of the No-fault Clinics, supplied by the Retailers, and the perioperative and/or postoperative rental DME and/or compression devices prescribed after the referral to an ASC, the Covered Persons often receive at least four or more pieces of rental DME and/or compression devices, for up to 28 days or longer. In many cases, the Covered Persons receive at least three or more such Rental DME items, for up to 28 days or longer.

164.    In sum, Covered Persons purportedly receiving expensive Rental DME from the Retailers, often receiving more than ten (10) standard DME and/or orthotic devices and pain management rental DME, with additional pieces of perioperative and/or postoperative rental DME and/or compression devices, for up to 42 days or longer, in some cases exceeding $23,000.00 in a total cost for all of the items. By way of example and not limitation, the following Covered Persons received the same Rental DME and/or compression devices or similar battery of standard DME and/or orthotic devices:

- In connection with claims submitted on behalf of Covered Person A.M., 0710191875-02, Plaintiffs were billed for at least twenty-three pieces of DME and rental DME and/or compression devices along with related appliances provided by nine different companies amounting to $22,263.14. On April 24, 2023, pursuant to a prescription issued by Sonia Sikand, PA-C (not named as a Defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named as a Defendant in the Complaint), VR Ortho Inc. (not named as a defendant in the Complaint) purportedly provided a Orthopedic Car Seat (T5001) in the amount of $756.03. Thereafter, on May 15, 2023, pursuant to a prescription issued by Sonia Sikand, PA-C (not named as a Defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named as a Defendant in the Complaint), Hatzalah O.S. Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder Brace (Left) (L3671) and a Shoulder Brace (Right) (L3671) in the total amount of $1,380.46. Next, on June 13, 2023, pursuant to a prescription issued by Sonia Sikand, PA-C (not named as a Defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named as a Defendant in the Complaint), Lament Supply Group Inc. (not named as a defendant in the Complaint) purportedly provided a Cervical Pillow (E0190), a Bed Board (E0274), a Egg Crate Mattress (E0184), a Infrared Lamp (E0205), a Massager Percussor (E0480), a Lumbar Cushion (E2612), a Lumbar Orthosis (L0648), a Cervical Collar (L0180), Tens/EMS Belt (E0731), a Knee Support (Left) (L1831), a Shoulder Support Fitted (L3674), and a EMS Unit (L0762) in the total amount of $3,765.39. On June 23, 2023, pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), Healthy Elite Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder Orthosis (L3671) in the amount of $690.23. Next, on July 7, 2023, pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), Scarlet Supply Inc. (not named as a defendant

in the Complaint) purportedly provided a EMTT-Electromagnetic Therapy/Shoulder device (E1399) in the amount of $7,048.58. On the same day, July 7, 2023, Defendant Vue purportedly provided a Compression Hose with Wiring Adapter (E1399), a Cold Compression Therapy Unit (E1399), Ultrasound Patches (E1399), a Ultrasound Therapy Device (E1399), a Ultrasound Therapy Writing with Battery Pack (E1399), and a Shoulder Wrap (E1399), in the total amount of $8,622.45.

- In connection with claims submitted on behalf of Covered Person G.R., 0709525090-01, Plaintiffs were billed for at least twenty pieces of DME and rental DME and/or compression devices along with related appliances provided by eight different companies amounting to $24,462.41. On April 25, 2023, pursuant to a prescription issued by Jung Hwa Paik, NP (not named as a Defendant in the Complaint) of Comfort Care NP in Family Health, P.C. (not named as a Defendant in the Complaint), Electromeg Supply Corp. (not named as a defendant in the Complaint) purportedly provided a Electronic Osteogenesis Stimulator (E0747) and a Electronic Osteogenesis Stimulator (A4452) in the total amount of $3,301.10. Thereafter, on May 9, 2023, pursuant to a prescription issued by Jung Hwa Paik, NP (not named as a Defendant in the Complaint) of Comfort Care NP in Family Health, P.C. (not named as a Defendant in the Complaint), Ortho Flex Med Supply Inc. (not named as a defendant in the Complaint) purportedly provided a Orthotic Car Seat (T5001), a Cervical Pillow (E0190), a Cervical Collar (two piece) (E0180), a Bed Board (E0273), a Dry Pressure Mattress (E0184), a General Use Back Cushion (E2611), a Lumbar-Sacral Orthosis (L0650), and a Thermophore (E0215) in the total amount of $1,978.22. Next, on June 9, 2023, pursuant to a prescription issued by Jung Hwa Paik, NP (not named as a Defendant in the Complaint) of Comfort Care NP in Family Health, P.C. (not named as a Defendant in the Complaint), Ahava Medical Supply Corp. (not named as a defendant in the Complaint) purportedly provided a Shoulder Orthosis (L3674) and a Cervical Traction Equipment (E0855) in the total amount of $1,399.55. On June 21, 2023, pursuant to a prescription issued by Jung Hwa Paik, NP (not named as a Defendant in the Complaint) of Comfort Care NP in Family Health, P.C. (not named as a Defendant in the Complaint), Med Durable Inc. (not named as a defendant in the Complaint) purportedly provided a Pain Away Laser Home Care device (E1399) in the amount of $3,912.50. Thereafter, on June 29, 2023, pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), Healthy Elite Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder Orthosis (L3671) in the amount of $690.23. Next, on July 10, 2023, pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), Scarlet Supply Inc. (not named as a defendant in the Complaint) purportedly provided a EMTT-Electromagnetic Therapy/Shoulder device (E1399) in the amount of

$7,048.58. That same day, on July 10, 2023, pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint), of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), Defendant Vue purportedly provided a Cold and Compression Therapy Unit (E1399), a Compression Hose with Wiring Adapters (E1399), a Ultrasound Therapy Device (E1399), Ultrasound Patches (E1399), a Shoulder Wrap (E1399), a Ultrasound Therapy Wiring with Battery Pack (E1399), in the total amount of $8,622.45.

- In connection with claims submitted on behalf of Covered Person F.A., 0694240615-02, Plaintiffs were billed for at least eleven pieces of DME and rental DME and/or compression devices along with related appliances provided by four different companies amounting to $10,888.79. On December 19, 2022, pursuant to a prescription issued by a physician (not named as a Defendant in the Complaint) EZ Triboro Services, Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder Orthosis, acrimio/clavicular (L3670), in the amount of $111.07. Thereafter, on December 27, 2022, pursuant to a prescription issued by Anjani Sinha, M.D. (not named as a Defendant in the Complaint) of Anjani Sinha Medical P.C. (not named as a Defendant in the Complaint), Defendant Monac purportedly provided a Synthetic Sheepskin Paf (E0188), in the amount of $19.50. Starting on that same day, December 27, 2022, and continuing to January 26, 2023, pursuant to a prescription issued by Anjani Sinha, M.D. (not named as a Defendant in the Complaint) of Anjani Sinha Medical P.C. (not named as a Defendant in the Complaint), Defendant Monac purportedly provided a Shoulder CPM (E09036), in the total amount of $3,409.69. On January 4, 2023, pursuant to a prescription issued by Jean Pierre Bakarat, M.D. (not named as a Defendant in the Complaint) of Far Rockaway Medical P.C. (not named as a Defendant in the Complaint), Medicus Supply Corp. (not named as a Defendant in the Complaint) purportedly provided a Cervical Pillow (E0190), a Cervical Collar (two piece) (L0180), a Bed Board (E0274), a Dry Pressure Mattress (E0184), a General Use Back Cushion (E2611), and a Lumbar-Sacral Orthosis (L0650), in the total amount of $1,252.29. Subsequently, beginning on January 10, 2023 and continuing to January 23, 2023, pursuant to a prescription issued by Anjani Sinha, M.D. (not named as a Defendant in the Complaint) of Anjani Sinha Medical P.C. (not named as a Defendant in the Complaint), Defendant Monac purportedly provided a Cold Therapy and Compression Device (E1399), in the total amount of $1,330.00. On January 25, 2023, pursuant to a prescription issued by Jean Pierre Bakarat, M.D. (not named as a Defendant in the Complaint) of West Hempstead Health & Wellness Group Inc. (not named as a Defendant in the Complaint), CCCP Equipment, Inc. (not named as a Defendant in the Complaint) purportedly provided a Pulsed Electromagnetic Therapy Device (E1399), in the amount of $4,766.24.

- In connection with claims submitted on behalf of Covered Person R.K., 0690970264-02, Plaintiffs were billed for at least twenty-six pieces of DME and rental DME and/or compression devices along with related appliances provided by forty-four different companies amounting to $27,077.19. On November 23, 2022, pursuant to a prescription issued by Phyliss Gelb, M.D. (not named as a Defendant in the Complaint) of Avenue Medical Care, P.C. (not named as a Defendant in the Complaint), Prompt Medical Group Inc. (not named as a defendant in the Complaint) purportedly provided a Cervical Pillow (E0190), a Cervical Multiple Post Collar (L0180), a Lumbar Orthosis Sagittal (L0650), a General Use Back Cushion (E2611), a Bed Board (E0274), a Egg Crate Mattress (E0272), a Electric Heating Pad Moist (E0215), a Orthopedic Car Seat (T5001), a Knee Orthosis Losking (L1831), a Shoulder Vest Type (E3675), and a Water Circulating Heat Pad with Pump (E0217), in the total amount of $2,107.00. Subsequently, on December 16, 2022, pursuant to a prescription issued by Demetrios Karakizis, D.C. (not named as a Defendant in the Complaint) of 2354 Chiropractic P.C. (not named as a Defendant in the Complaint), Prompt Medical Group Inc. purportedly provided a LSO APL Control, Custom Fitted (L0632), in the amount of $1,150.00. That same day, December 16, 2022, pursuant to a prescription issued by Phyliss Gelb, M.D. of Avenue Medical Care, P.C., Prompt Medical Group Inc. purportedly provided a E.M.S. Belt (E1399), a E.M.S. Unit 4 Lead (E1399), a Infrared Lamp (E0205), a Massager (E1399), a Hydrotherapy Whirlpool (E1399), Shoulder Orthosis Abduct (L3674), a Cervical Traction Set (E0855), a KO Rigid Adj. Custom Fitted (L1832), and another Shoulder Orthosis Abduct (L3674), in the total amount of $4,281.27. On December 29, 2022, pursuant to a prescription issued by Azriel Benaroya, M.D. (not named as a Defendant in the Complaint) of Anarafena Medical, PLLC (not named as a Defendant in the Complaint), Defendant Monac purportedly provided a Knee Orthosis, Elastic with Condylar Pad (L1820), in the amount of $110.00. Beginning on that same day, December 29, 2022, and continuing to January 25, 2023, pursuant to a prescription issued by Azriel Benaroya, M.D. (not named as a Defendant in the Complaint) of Anarafena Medical, PLLC (not named as a Defendant in the Complaint), Defendant Monac purportedly provided a Cold Compression Therapy Device (E1399), for a total amount of $2,660.00. On November 23, 2022, pursuant to a prescription issued by Phyliss Gelb, M.D. (not named as a Defendant in the Complaint) of Avenue Medical Care, P.C. (not named as a Defendant in the Complaint), Irina Medical Supplies Inc. (not named as a defendant in the Complaint) purportedly provided a Osteogenesis Stimulator, electrical, non-invasive, other than spinal applications (E0747) and waterproof tape (A4452), in the total amount of $3,300.11. Thereafter, beginning on January 12, 2023, and continuing to February 4, 2023, pursuant to a prescription issued by Azriel Benaroya, M.D. (not named as a Defendant in the Complaint) of Anarafena Medical, PLLC (not named as a Defendant in the

Complaint), Defendant Monac purportedly provided a Knee CPM (E09036), in the total amount of $2,399.76.

165.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the Covered Persons, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

### 1.    Fraudulent Billing for Continuous Passive Motion Machines

166.    In furtherance of the scheme to defraud alleged herein, Bobkov, through Monac, routinely submitted or caused to be submitted bills to Plaintiffs for CPM Devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

167.    As a matter of pattern, practice, and protocol, Bobkov, through Monac, mailed or caused to be mailed to Plaintiffs prescription forms which they knew or should have known to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich Bobkov through a fraudulent protocol of treatment.

168.    CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM Device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is

programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

169.    CPM Devices have no medical utility except in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

170.    CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of Covered Persons, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334), which concluded that it is unknown whether CPM offers any benefit after shoulder surgery. In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important effects on active knee flexion ROM, pain, function, or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patients randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery, found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

171.    In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

172.    CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

173.    Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Bobkov, through Monac, and pursuant to illicit kickback agreements with the HCPs, filled needless prescriptions for CPM Devices to Covered Persons who purportedly underwent such procedures.

174.    Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied by Monac pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

175.    In a legitimate medical clinic setting, the HCP prescribing post-surgical DME provider should evaluate and document multiple factors for the necessity of the Rental DME, including, but not limited to: (i) whether the Covered Person is capable of using the at-home treatment devices; (ii) whether the DME is likely to help improve the Covered Person's surgical recovery; and (iii) whether the Covered Person is likely to use the DME. In nearly all circumstances, the medical reports neglect to document any such findings nor describe how the Rental DME directly related to each Covered Persons' individual presentation for post-surgical recovery.

176.    Moreover, it is extremely improbable that virtually all of the Covered Persons who received DME from Monac and other DME providers, that underwent minimally invasive surgical procedures, would ultimately receive the same and/or nearly identical post-surgical DME, despite being differently situated. However, pursuant to the predetermined fraudulent protocols implemented by Monac and others, the Covered Persons who underwent a surgical procedure were prescribed virtually identical post-surgical fraudulent Rental DME.

177.    In that regard, to the extent that there was a contemporaneously dated operative report issued by the HCP and/or any follow reports, the reports virtually always omitted references to Rental DME prescribed, how it was supposed to be used and how or whether the Rental DME was assisting the Covered Persons' recovery.

178.    Furthermore, in keeping with the fact that the prescriptions for Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the Rental DME, and CPMs in particular, purportedly prescribed by the HCPs was always prescribed for durations far beyond the accepted medical literature concerning the duration of use for the items.

179.    Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Monac routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for up to 42 days.

180.    On information and belief, although CPM Devices can be purchased from legitimate companies for less than Monac's accumulated monthly charges for the particular items, Monac systematically represent that the inexpensive CPMs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

181.    Specifically, after the change in the maximum reimbursement amount in the Fee Schedule for CPM Devices as part of the adoption of the WCB Fee Schedule, Bobkov, through Monac, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee, at an inflated daily rates $99.99 and $109.99 per day per Covered Person, using billing code E0936, resulting in total charges in amounts up to $6,159.44 per Covered Person.

182.    In addition, Bobkov, through Monac, routinely submitted bills to Plaintiffs for the rental of CPM Devices for use on the knee, at an inflated daily rate of $99.99 per day per Covered Person, using billing code E0935, resulting in total charges in amounts up to $3,799.62 per Covered Person.

183.    Notwithstanding that the Medicare rate for a CPM is only $21.50 per day, and the WCB DME Fee Schedule rates for Knee CPMs and CPMs for other limbs are only $18.88 per day and $31.19 per day, respectively, the charges by Monac far exceeded those rates and are

grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

184.    Upon information and belief, Bobkov, through Monac, did not submit any documentation to verify the charges Monac made for CPMs billed under codes E0935 and E0936 because no documentation exists that support the daily rental rates charged by Monac for the CPMs it purportedly provided to Covered Persons.

185.    Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Bobkov, through Monac, submitted fraudulent bills for the rental of CPM Devices to Plaintiffs using billing codes E0935 and/or E0936. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0673155479-06, 0673720488-02, 0690970264-02, and 0694240615-02, in which Bobkov, through Monac, mailed or caused to be mailed fraudulent claims for CPM Devices, billed under codes E0935 and/or E0936, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

186.    The bills mailed or caused to be mailed by Bobkov, through Monac, were fraudulent in that they misrepresented that (i) the CPM Devices were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact they were prescribed solely to enrich Defendants; and (iv) the fee charged for the CPM Device was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the

maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Bobkov, through Monac, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive CPM Devices that they were not entitled to receive under the No-fault law and implementing regulations.

### 2.    Fraudulent Billing of Compression Devices

187.    In furtherance of the scheme to defraud alleged herein, Bobkov, through Monac and Vue, routinely submitted bills to Plaintiffs for cold compression devices ("Compression Devices") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

188.    In many instances, the Covered Persons that receive Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.

189.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive pain management Rental DME, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

190.    After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, many of the Covered Persons are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

191.    After the surgery at the ASC, the Covered Persons are also purportedly provided with expensive rental post-surgical, rehabilitative DME and/or compression devices, along with several pieces of Rental DME.

192.    A compression device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. A cold compression device, operates similarly but simultaneously applies cold therapy to the affected area of the Covered Person.

193.    Compression devices are used to improve venous circulation in the limbs of a Covered Person suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

194.    The use of compression devices is rarely indicated in the types of procedures performed on the Covered Person to prevent limb edema. In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb.

195.    The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

196.    In keeping with the fact that the Compression Devices purportedly provided by Monac, and Vue were medically unnecessary, the prescriptions purportedly filled by provision of the devices are never given to the Covered Persons. Instead, the prescriptions are sent from

many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

197.    On information and belief, in numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental DME, generally, and the Compression Devices, in particular.

198.    Upon receipt of the prescriptions purportedly filled by provision of Compression Devices, Monac routinely bills to insurers regardless of actual Covered Person need, and is some cases, to multiple covered persons involved in the same accident, in order to maximize reimbursement. Furthermore, in the case of Monac, it routinely submits bills to insurers for rental periods of up to six (6) weeks.

199.    On information and belief, upon receipt of the prescriptions purportedly filled by provision of Compression Devices, Vue routinely submits bills to insurers indicating that the items is provided to the Covered Person for a single day, when, in actuality, the items is provided for rental periods of up to one month regardless of actual Covered Person need in order to maximize reimbursement.

200.    On information and belief, oftentimes, the devices are delivered to the Covered Persons without the Covered Persons' knowledge that they were going to receive the device. Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and as a result, the Covered Persons do not use the device and/or use the device improperly posing a risk to the Covered Persons' health as well rendering the device ineffective.

201.    The Compression Devices supplied by the Retailers were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply

66

insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

202.    In a legitimate medical clinic setting, the HCP prescribing post-surgical DME provider should evaluate and document multiple factors for the necessity of the Rental DME, including, but not limited to: (i) whether the Covered Person is capable of using the at-home treatment devices; (ii) whether the DME is likely to help improve the Covered Person's surgical recovery; and (iii) whether the Covered Person is likely to use the DME. In nearly all circumstances, the medical reports neglect to document any such findings nor describe how the Rental DME directly related to each Covered Persons' individual presentation for post-surgical recovery.

203.    Moreover, it is extremely improbable that virtually all of the Covered Persons who received DME from the Retailers and other DME providers, that may have undergone minimally invasive surgical procedures, would ultimately receive the same and/or nearly identical pre-and post-surgical DME, despite being differently situated. However, pursuant to the predetermined fraudulent protocols implemented by the Retailers and others, the Covered Persons who underwent a surgical procedure were prescribed virtually identical pre- and/or post-surgical fraudulent Rental DME.

204.    In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination and/or operative report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for Rental DME provided to Covered Persons by the Retailers were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the

contemporaneous examination and operative reports written by the HCPs virtually never referenced the Compression Devices supplied by the Retailers and never explained the necessity for the device.

205.    In keeping with the fact that the Compression Devices were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the medical clinics that purportedly examined the Covered Persons were issued on boilerplate, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device: "This pneumatic cold compression therapy system will provide my patient adjustable cold and intermittent compression. Insofar as it is a proven and effective technique in post-operative recovery. Respectively, the Cold Therapy Unit will productively reduce recovery time as well as reducing swelling, edema and pain." There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. Furthermore, in nearly all instances the device is prescribed for an identical period of 14 days and/or 28 days regardless of the Covered Persons' conditions. By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of prescriptions with the identical, boilerplate language.

206.    In view of the foregoing, the Compression Devices supplied by the Retailers were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

207.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Monac provided Covered Persons Compression Devices on a rental basis for the period of at least one month.

208.    At all relevant times mentioned herein, Bobkov, through Vue, routinely billed Plaintiffs under code E1399 in amounts up to $1,799.99 for a purported sale of Compression Devices.

209.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Vue provided Covered Persons Compression Devices on a rental basis for the period of at least one month.

210.    Upon information and belief, in connection with such claims, Bobkov, through Monac and Vue, submitted or caused to be submitted wholesale invoices reflecting an acquisition cost of $1,199.50 per Cold Compression Device.

211.    Upon information and belief, the maximum permissible monthly rental rate for Cold Compression Devices billed for by Monac and Vue under billing code E1399 is ten percent of its acquisition cost, or $119.95.

212.    Notwithstanding, Monac and Vue grossly over-billed Plaintiffs for a one month rental of Cold Compression Devices, far in excess of the maximum permissible for the Compression Devices Monac and Vue purportedly provided under code E1399.

213.    Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims submitted by Bobkov, through the Retailers, to Plaintiffs for Compression Devices under code E1399 in amounts far in excess of what is permissible under the No-fault Law. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0690970264-02,

0684380645-01, 0682113501-02, 0678161555-08, 0709525090-01, and 0703196203-01, in which Bobkov, through the Retailers, mailed or caused to be mailed fraudulent claims for Compression Devices, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

214.    The bills mailed or caused to be mailed by Bobkov, through the Retailers, were fraudulent in that they misrepresented that (i) the Compression Devices were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact they were prescribed solely to enrich Defendants; and (iv) the fee charged for the Compression Device was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Bobkov, through the Retailers, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Compression Devices that they were not entitled to receive under the No-fault law and implementing regulations.

### 3.    Fraudulent billing of Sustained Acoustic Medicine ("SAM") Units

215.    In furtherance of the scheme to defraud alleged herein, Bobkov, through Vue, routinely submitted bills to Plaintiffs for Sustained Acoustic Medicine ("SAM") Units that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

216.    Each of the Covered Persons that received SAM units were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.

217.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing, and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive rental pain management DME, such as SAM Units from Vue, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

218.    After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, many of the Covered Persons are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

219.    After the surgery at the ASC, the Covered Persons are also purportedly provided with expensive rental post-surgical, rehabilitative DME and/or compression devices.

220.    The SAM Unit is a battery powered, wearable and portable device that purports to produce ultrasound at a frequency of 3 megahertz in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period.

221.    On information and belief, notwithstanding its intended use, the ultrasound purportedly provided by the SAM Unit is insufficient to produce clinically effective heating.

222.    Moreover, the heating pattern of the SAM Unit is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP. For example, the ultrasound purportedly provided by the SAM Unit only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles. In fact, Aetna has issued a policy bulletin that established that sustained acoustic medicine (SAM Units) is experimental, investigational, or unproven. *See* https://www.aetna.com/cpb/medical/data/600_699/0673.html#:~:text=Medial%20knee%20implanted%20shock%20absorber,which%20includes%20stem%20cell%20therapy. And neither does there exist a Medicaid DME Procedure Code for SAM Units.

223.    In keeping with the fact that the prescriptions for the Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the DME purportedly prescribed did not provide any medical benefit to Covered Persons.

224.    In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for the Rental DME were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescriptions forms contained the same exact boilerplate language proclaiming, among other things, that the SAM Unit will "reduce pain and accelerate the natural healing cascade for musculoskeletal related injuries, sam® has been clinically shown to increase Collagen Laydown, increase Oxygenated Hemoglobin in the muscle and increase Blood-flow to accelerate the recovery and reduction of pain for the associated injury." There is, however, no discussion of any of the patients' actual individual needs and diagnoses.

225.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for SAM Units for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, and in some instances, underwent or are about to undergo outpatient arthroscopic surgical procedures, along with a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the SAM Unit, the Covered Persons receive a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The SAM Units are often prescribed with one or more other rental DME devices such as CPMs, CTUs, and/or compression devices.

226.    In view of the foregoing, the Ultrasound/SAM Units supplied by Vue were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

227.    In that regard, Vue routinely billed Plaintiffs for Ultrasound/SAM Units under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

228.    On information and belief, notwithstanding that Vue provided the devices on a rental basis for dates of service of twenty-eight days or longer, their claims for reimbursement routinely misrepresented that it provided the devices to Covered Persons as a sale, indicating that it provided such items for a single day of service.

229.    On information and belief, the prescriptions for the SAM Units are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined SAM Unit provider in exchange for a kickback and/or other financial incentive or compensation.

230.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the SAM Units in particular.

231.    On information and belief, upon receipt of the prescriptions purportedly filled by provision of Ultrasound/SAM Units, Vue routinely submits bills to insurers indicating that the items is provided to the Covered Person for a single day, when, in actuality, the items is provided for rental periods of up to one month regardless of actual Covered Person need in order to maximize reimbursement.

232.    Oftentimes, the devices are delivered to the Covered Persons without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and as a result, the Covered Persons do not use the device and/or use the device improperly, posing a risk to the Covered Person's health as well as rendering the device ineffective.

233.    At all relevant times mentioned herein, Vue routinely billed Plaintiffs under code E1399 in the amount of $1,988.99 for a purported sale of a Ultrasound/SAM Unit.

234.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Vue provided Covered Persons Ultrasound/SAM Units on a rental basis for the period of one month.

235.    In connection with such claims, Bobkov, through Vue, submitted or caused to be submitted wholesale invoices reflecting an acquisition cost of $1,326.00 per Ultrasound/SAM Units.

236.    The maximum permissible monthly rental rate for Ultrasound/SAM Units billed for by Vue under billing code E1399 is ten percent of its acquisition cost, or $132.60.

237.    Notwithstanding, Vue grossly over-billed Plaintiffs for a one-month rental of Ultrasound/SAM Units, far in excess of the maximum permissible for the Ultrasound/SAM Units Vue purportedly provided under code E1399.

238.    By way of example and not limitation, Bobkov, through Vue, routinely submitted to Plaintiffs bills for Ultrasound/SAM Units under code E1399 as if the items were provided to Covered Person for sale, when, on information and belief, the items were actually provided as a rental at a monthly rental rate far in excess of what is permissible under the No-fault Law. Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims where Bobkov, through Vue, submitted fraudulent bills to Plaintiffs for Ultrasound/SAM Units under code E1399.

239.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0709525090-01, 0700392608-02, 0711223206-02, and 0703196203-01, in which Bobkov, through Vue, mailed or caused to be mailed fraudulent claims for Ultrasound/SAM Units, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

240.    The bills mailed or caused to be mailed by Bobkov, through Vue, were fraudulent in that they misrepresented that (i) the SAM Units were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact they were prescribed solely to enrich Defendants; and (iv) the fee charged for the SAM Unit was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Bobkov, through Vue, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive SAM Units that they were not entitled to receive under the No-fault law and implementing regulations.

<u>**DISCOVERY OF THE FRAUD**</u>

241.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- Bobkov, through the Retailers, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Bobkov, through the Retailers, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, and/or other financial relationships between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Bobkov, through the Retailers, knowingly misrepresented and concealed that the Retailers' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity in order to maximize reimbursement; and/or

- Bobkov, through the Retailers, knowingly and deliberately concealed the amounts the Retailers were entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

242.    Defendants engaged law firms to pursue the collection of their fraudulent No-fault claims submitted to Plaintiffs and other insurers, which routinely initiated hundreds of expensive and time consuming civil actions and arbitration proceedings against Plaintiffs and other insurers to monetize their fraudulent No-fault claims in the event Defendants' fraudulent No-fault claims were not promptly paid.

243.    Defendants' ongoing collection efforts through numerous separate No-fault collection proceedings are a calculated and essential part of Defendants' fraudulent scheme, based on Defendants knowledge of the inability of an arbitrator or civil court judge in a single collection proceeding, typically involving either a single Covered Person or a single bill, to effectively address the Defendants' large-scale and complex fraudulent scheme involving a predetermined treatment protocol applied to numerous Covered Persons across hundreds of claims purportedly receiving treatment at numerous different No-fault clinics.

244.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $262,000.00 based upon the fraudulent bill submissions.

245.    Based upon Defendants' material misrepresentations and their serial efforts to conceal the various components to their scheme to defraud, Plaintiffs did not discover and could not have reasonably discovered the injury until in or after January 2025.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS BOBKOV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

246.    The allegations of paragraphs 1 through 245 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

247.    At all times relevant herein, Monac was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

248.    From, in or about September 2022 through the date of the filing of this Complaint, Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Monac enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

249.    At all relevant times mentioned herein, Defendant Bobkov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Monac enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

250.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined

course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Bobkov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

251.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

252.    The racketeering acts set forth herein were carried out on a continued basis for nearly a three-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Bobkov, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

253.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Monac continues to pursue collection on the fraudulent billing to the present day.

254.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Bobkov, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does

1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Monac enterprise based upon materially false and misleading information.

255.    Through the Monac enterprise, Defendant Bobkov submitted numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Bobkov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Monac enterprise through the filing of this Complaint.

256.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Bobkov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

257.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

258.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

259.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and has been

damaged in the aggregate amount presently in excess of $90,000.00, the exact amount to be determined at trial.

260.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS BOBKOV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

261.    The allegations of paragraphs 1 through 245 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

262.    At all times relevant herein, Vue was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

263.    From, in or about May 2023 through the date of the filing of this Complaint, Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Vue enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

264.    At all relevant times mentioned herein, Defendant Bobkov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Vue enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

265.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Bobkov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

266.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

267.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Bobkov, one or more of the ABC Corporations 1 through 5, and one or more

of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

268.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Vue continues to pursue collection on the fraudulent billing to the present day.

269.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Bobkov, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Vue enterprise based upon materially false and misleading information.

270.    Through the Vue enterprise, Defendant Bobkov submitted numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Bobkov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Vue enterprise through the filing of this Complaint.

271.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Bobkov

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

272.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

273.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

274.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and has been damaged in the aggregate amount presently in excess of $134,000.00, the exact amount to be determined at trial.

275.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants Bobkov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS RETAILERS AND BOBKOV**

**(Common Law Fraud)**

276.    The allegations of paragraphs 1 through 245 are hereby repeated and realleged as though fully set forth herein.

277.    Defendants Retailers and Bobkov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

278. Each and every bill and supporting documentation submitted by Defendants Retailers and Bobkov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

279. Defendants Retailers and Bobkov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law;

- False and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022 and/or (e) not billed in excess of one-tenth of the acquisition cost to the durable medical equipment provider, calculated on a pro-rata basis using a 30-day month, for dates of service on or after June 1, 2023;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol irrespective of medical necessity; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Bobkov, through the Retailers, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

280. The foregoing was intended to deceive and mislead Plaintiffs into paying the Retail Defendants' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

281. Defendants Retailers and Bobkov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

282. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Retailers and Bobkov.

283. Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendant Retailers' claims for No-fault insurance benefits submitted in connection therewith.

284. Furthermore, the far-reaching pattern of fraudulent conduct by the Retail Defendants evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

285. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Indemnity Company have sustained compensatory

damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $262,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS RETAILERS AND BOBKOV

### (Unjust Enrichment)

286.    The allegations of paragraphs 1 through 245 are hereby repeated and realleged as though fully set forth herein.

287.    By reason of their wrongdoing, Defendants Retailers and Bobkov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

288.    Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Indemnity Company are therefore entitled to restitution from Defendants Retailers and Bobkov in the amount by which it has been unjustly enriched.

289.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $262,000.00 the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FIFTH CLAIM FOR RELIEF

## AGAINST RETAILERS

## (Declaratory Judgment under 28 U.S.C. § 2201)

290.   The allegations of paragraphs 1 through 245 are hereby repeated and realleged as though fully set forth herein.

291.    At all relevant times mentioned herein, each and every bill mailed by Bobkov, through the Retailers, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

292.   To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

293.   At all times relevant herein, the Retailers exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

294.   In view of the Retailers' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retailers have no right to receive payment for any pending bills it has submitted because:

- The Retailers made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and/or

- The Retailers made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

295.    As the Retailers have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retailers are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retailers' No-fault claims.

296.    Plaintiffs have no adequate remedy at law.

297.    The Retailers will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)    Compensatory damages in an amount in excess of $262,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)    Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First and Second Claims for Relief, together with prejudgment interest;

iv)    Compensatory and punitive damages on the Third Claim for Relief, together with prejudgment interest;

v)    Compensatory damages on the Fourth Claim for Relief, together with prejudgment interest;

vi)    Declaratory relief on the Fifth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retailers because (1) the Retailers made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) The Retailers made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
       February 20, 2026

                                        **MANNING & KASS, ELLROD, RAMIREZ,**
                                            **TRESTER LLP**

                                  By:   /s/ Lee Pinzow
                                        Robert A. Stern, Esq.
                                        James McKenney, Esq.
                                        Karina Trost, Esq.
                                        Lee Pinzow, Esq.
                                        R. Drake Herring, Esq.
                                        Attorneys for Plaintiffs
                                        100 Wall Street, Suite 700
                                        New York, NY 10005
                                        Phone: (212) 858-7769

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

PLAINTIFFS,

-against-

MONAC SUPPLY INC., VUE SUPPLY INC., VIACHESLAV BOBKOV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,

DEFENDANTS.

CIVIL ACTION

26-CV-1006

COMPLAINT

(TRIAL BY JURY DEMANDED)

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769